IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 83182-8-I |
| Respondent, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| BRADLEY T. SHAW, | |
| Appellant. | |

DÍAZ, J. — Appellant Bradley Shaw (Shaw) appeals his conviction of two counts of murder in the first degree with firearm enhancement, for the killing of two residents of a homeless encampment in Kent, Washington. Shaw complains that the trial court's evidentiary rulings—excluding certain behaviors or traits of the victims, while admitting reference to Shaw's prior unrelated harassment charge—deprived him of his right to present his full self-defense claim and were improper, respectively. Shaw also claims that the prosecutor committed misconduct by referencing that harassment charge in closing argument and misstating the law on self-defense. Finally, Shaw claims the trial court erred by giving a first aggressor instruction, arguing there was insufficient evidence to warrant that instruction, and

Citations and pin cites are based on the Westlaw online version of the cited material.

by not severing the individual charges into separate trials. Finding no error, we affirm the judgment and sentence.

I.     FACTS

Shaw got into an argument with Louisa Campos at a convenience store on August 11, 2016. Shaw watched Campos as she left the store and saw her walk toward a nearby homeless encampment where she, Robert Dias, and approximately nine others resided.

The next day, Shaw went to the homeless encampment to look for her, and another resident of the encampment directed Shaw to her tent. As Shaw approached the tent, Campos came out and Shaw shot her three times, killing her.

Multiple witnesses testified that, right before the shooting, Campos asked Shaw if he wanted to sit down and then asked Shaw, either "Are you here to fight me?" and/or "Are you here to kill me?" One resident of the camp testified that he heard Shaw say, "I'm going to kill you," or "I want to kill you," and heard Campos respond, "quit playing."

For his part, Shaw testified that the first thing he heard Campos say was "are you here to kill me," that her eyes were darting, and that she sprang at and followed him, reaching for his gun. Shaw testified that these actions confirmed his "bad feeling" upon arriving at her tent. On cross-examination, Shaw repeated that he had a "bad feeling" or "red flag" about Campos.

2

The following morning, August 13, 2016, Shaw returned to the encampment, claiming he was there to recover shell casings and to "piece things together." He took his gun, which he carried in a holster on his right hip. As he wandered around the camp, Shaw encountered Dias, who had provided a statement about Campos's shooting to the police and was the only resident at the encampment who stayed overnight. Shaw claims that Dias heard him and yelled at him, which caused Shaw to hide behind a tree. Shaw claims Dias emerged with a baseball bat and tried to swing it at him, causing Shaw to shoot him three to six times, and kill him.

Approximately two months later, as will be discussed in more detail below, Shaw was charged with felony harassment for pointing a gun at an acquaintance and threatening to kill that person. He was ultimately referred to veteran's court and his charge was reduced to a misdemeanor.

Approximately 10 months later, or one year after the killings, Shaw confided to a friend that he had killed two people and that it was not in self-defense. Shaw further told his friend that he had gone to the camp looking for witnesses. During his own testimony, Shaw confirmed that his friend's description of the conversation was largely accurate and confirmed that he told his friend that the killings were not in self-defense. The friend notified the police who arrested Shaw.

Shaw was convicted by jury of two counts of premeditated murder in the first degree with firearm enhancements. The jury rejected lesser offenses of

murder in the second degree, manslaughter in the first degree, and manslaughter in the second degree as to both counts.

## II.     DISCUSSION

### A.     Right to Present a Defense

When a trial court's evidentiary ruling is challenged and a defendant claims a violation of his Sixth Amendment right to present a defense, we apply a two-part test.  State v. Jennings, 199 Wn.2d 53, 58, 502 P.3d 1255 (2022) (citing State v. Arndt, 194 Wn.2d 784, 453 P.3d 696 (2019)).  First, we analyze the lower court's ruling for an abuse of discretion, applying the evidentiary rule or evidentiary statute at issue.  Id. at 58-59.  A trial court abuses its discretion if no reasonable person would take the view it adopted.  State v. Atsbeha, 142 Wn.2d 904, 914, 16 P.3d 626 (2001).

Second, if we find no abuse of discretion, we then consider de novo whether the ruling violated the defendant's Sixth Amendment right to present a defense. Jennings,199 Wn.2d at 58-59.  While the right to present a defense to a criminal charge is constitutionally guaranteed, it is not an absolute right to present all evidence the defendant would like.  "[T]he Constitution permits judges to exclude evidence that is repetitive . . . only marginally relevant or poses an undue risk of harassment, prejudice, [or] confusion of the issues."  State v. Orn, 197 Wn.2d 343, 352, 482 P.3d 913 (2021) (quoting Holmes v. South Carolina, 547 U.S. 319, 326-27, 126 S. Ct. 1727, 164 L. Ed. 2d 503 (2006)) (alterations in original).  Importantly,

there is a "distinction between evidence that merely bolsters credibility and evidence that is necessary to present a defense." Jennings, 199 Wn.2d at 66-67.

1. Toxicology report

   a. Background

A toxicology report revealed that the blood draw performed during the autopsies revealed that both Dias and Campos tested positive for controlled substances. Prior to trial, Shaw argued the report should be admitted as evidence as it was relevant to corroborate his "perception that [there was] something off kilter and threatening" about the victims, and show that this perception was objectively reasonable, especially with regards to Campos. In pertinent part, the State argued that the toxicology results would cause jurors to speculate about how the drugs might have affected the victims's behavior, and the medical examiner could not say from the toxicology report what impact any substances would have had on the victims. The trial court excluded the toxicology reports, finding Shaw did not present evidence about when, if, and how the substances affected the victims.

   b. Applicable evidentiary rules

For evidence to be admitted at trial, it must be relevant. ER 402. Evidence is relevant if it tends to prove or disprove the existence of a fact of consequence to the outcome of the case. State v. Weaville, 162 Wn. App. 801, 818, 256 P.3d 426 (2011). Relevant evidence "may be excluded if its probative

value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." ER 403. These are "well-established, commonly utilized rule[s] that ha[ve] been applied time and again without any demonstrated detriment to the fairness of proceedings" and, as such, are not as "paramount" as when "a new or antiquated rule appears to threaten the defendant's right to a fair trial." State v. Ritchie, 24 Wn. App. 2d 618, 634-35, 520 P.3d 1105 (2022).

        c. Analysis

As to the first step of the two-part analysis, Jennings also dealt with the exclusion of a toxicology report, where a "key component of Jennings's self-defense argument was that he reasonably believed that [the victim] was high on methamphetamine and that in his experience such individuals are erratic, aggressive, and violent." Jennings, 199 Wn.2d at 61. Jennings argued that the toxicology report was relevant to weighing the reasonableness of his fear because the report would have corroborated his impression that the victim was high. Id.

Our Supreme Court concluded that the State's argument that Jennings did not know the effect that methamphetamine may have had on the victim was at least reasonable, as Jennings offered no witness testimony as to the potential effects on the victim or that he had observed the victim under the influence of methamphetamine. Id. at 62-63. Under these facts, our Supreme Court concluded

that a reasonable court could conclude that the toxicology report was speculative and might confuse the jury and, thus, where such reasonable minds could differ, the trial court did not abuse its discretion. Id. at 63; see also State v. Richmond, 3 Wn. App. 2d 423, 431-32, 415 P.3d 1208 (2018); State v. Lewis, 141 Wn. App. 367, 386-91, 166 P.3d 786 (2007). In other words, while the toxicology report may have been relevant under ER 401, it was not an abuse of discretion for the trial court to find that its relevance was substantially outweighed by the risk of undue prejudice and confusion of the jury under ER 403.

Here, similarly, there was neither testimony as to when the victims took these drugs, nor was there testimony regarding if or how these drugs may have affected them, including whether they would have thereby presented as "off kilter and threatening." Jennings is squarely on point then as to the first step of the two-step Jennings process: a reasonable court could find that, without such additional evidence, the toxicology report could prompt improper speculation by, or create confusion for, the jury. Indeed, in reply, Shaw basically concedes that the court did not abuse its discretion. Reply Br. of Appellant at 4.

Moving to the second step, Shaw, instead, argues that Jennings is distinguishable because this evidence is necessary to Shaw's self-defense claim, in a way it was not in Jennings. Specifically, Shaw claims that he was not able to present his defense that Campos and Dias appeared "off kilter" and threatening, as the toxicology report was the only other evidence showing that Shaw's

7

perception was reasonable. Stated otherwise, Shaw argues that the toxicology report here was of "extremely high probative value"—unlike the toxicology report in Jennings, which merely corroborated Jennings's claim that he believed the victim took drugs based on his experience of observing drug users—because Shaw had no experience with how persons presented when on those drugs. And, Shaw continues, the State's concerns for confusion or speculation could not outweigh that high level of probative value.

The State responds, in part,[1] that this argument would apply only to Campos, as Shaw did not testify that he thought Dias was "off" or "not right." The State is correct as to Dias and we will not consider his toxicology report further.

As to Campos, pursuant to the second step of the two-step analysis, the toxicology report remains properly excluded. The toxicology report is not "crucial evidence relevant to the central contention of a valid defense," because there can be no clear inferences from the report as to the Campos's presentation or behavior. State v. Young, 48 Wn. App. 406, 413, 739 P.2d 1170 (1987). In other words, there is not sufficient information in the record to draw an inference from the words in the report to a finding that Campos presented as "off kilter" or "not right" at the

---

[1] The State further argues that the court properly excluded the toxicology report because, factually, Shaw's testimony did not include a claim that they had used drugs specifically, and because Shaw exaggerated the amount of drugs found in the victims's blood. We need not reach these issues.

moment of the killings. Without such an inference, the chemistry described in the report is not relevant to Shaw's perceptions.

Moreover, as our Supreme Court stated, there is an important and "clear distinction" between "merely bolstering" a defense and "evidence that is necessary to present a defense." Jennings, 199 Wn.2d at 66-67. That distinction is dispositive here. While it may have been helpful for the toxicology report to be admitted, the report would have been used only to provide an explanation why, or to bolster, Shaw's testimony that Campos was "off." Where evidence is offered simply to validate other evidence already in the record, particularly as to a witness's testimony, it goes from necessary or crucial to something less.

Further, the exclusion of the toxicology report did not prevent the jury from finding Shaw's testimony about the manner of the victims credible. Shaw's testimony about the location and state of the homeless encampment and its residents may have been enough corroboration of Shaw's negative impression.

Finally, even if it were central or necessary to the defense, "phrasing an evidentiary ruling as a constitutional claim [does not] provide[ ] a means for an end run around the Rules of Evidence. Nor is the second step analysis merely a repetition of the analysis undertaken at step one." Ritchie, 24 Wn. App. 2d at 628-29 (citation omitted). In other words, "[i]f the evidence is relevant, the reviewing court must weigh the defendant's right to produce relevant evidence against the State's interest in limiting the prejudicial effects of that evidence to determine if

9

excluding the evidence violates the defendant's constitutional rights." Jennings, 199 Wn.2d at 63.

Here, for the reasons provided above, the evidence is minimally, if at all, relevant to explain Shaw's perceptions, and the unfair prejudice of painting Campos as a drug-crazed aggressor is high. After such weighing, we conclude that there was no abuse of discretion at the evidentiary level, or violation of Shaw's constitutional rights.

2. Campos's reputation evidence

a. Applicable rules of evidence

Evidence of a person's character is generally inadmissible for the purpose of proving action in conformity therewith on a particular occasion. ER 404(a). A victim's reputation for violence is admissible, however, when the defendant alleges self-defense and shows that knowledge of the victim's reputation for violence contributed to his reasonable apprehension. State v. Callahan, 87 Wn. App. 925, 934, 943 P.2d 676 (1997); ER 404(a)(2); ER 405(a) (proof may be made by testimony). Further, "reputation evidence must be based upon the witness's personal knowledge of the victim's reputation in a relevant community during a relevant time period." Callahan, 87 Wn. App. at 934 (citing State v. Riggs, 32 Wn.2d 281, 284, 201 P.2d 219 (1949)).

"To establish a valid community, the party seeking to admit the reputation evidence must show that the community is both neutral and general." State v. Land, 121 Wn.2d 494, 500, 851 P.2d 678 (1993).

"The decision as to whether the foundation for a valid community has been established rests within the proper discretion of the trial court." Id. Importantly, this court has held that, "For purposes of reputation testimony, the criminal justice system is neither neutral nor sufficiently generalized to be classified as a community." Callahan, 87 Wn. App. at 935 (citing State v. Lord, 117 Wash.2d 829, 874, 822 P.2d 177 (1991)).

b. Analysis

Prior to trial, Shaw expected to offer evidence about Campos's reputation for violence through two Kent police detectives, describing her as an "animal," "violent," and aggressive, as well as a trained boxer and expert in karate. The State countered, in pertinent part, that the Kent police department is not a valid community for reputation evidence under Callahan.

On appeal, Shaw attempts to distinguish Callahan, asserting that (a) "the officers with knowledge of Campos's reputation did not gain it by looking at her rap sheet" but knew her "personally" and (b) Kent police officers should be viewed as "part of the broader community of Kent."

As to the former, that is a distinction without a difference and one without any support under binding law. As to the latter, pursuant to binding precedent of

11

our Supreme Court, we conclude that a police department, like Kent's, continues not to be a "neutral" or "generalized" community for purposes of reputation evidence. Lord, 117 Wn.2d at 874.

Furthermore, Shaw does not attempt to rebut the fact that Campos's alleged reputation for violence was not known to Shaw at the time he shot her and is, therefore, irrelevant to show it contributed to his apprehension. Callahan, 87 Wn. App. at 934 ("reputation evidence must be based upon the witness's personal knowledge of the victim's reputation in a relevant community during a relevant time period."). Thus, we conclude that the court did not abuse its discretion in excluding this evidence.

Finally, whether or not the testimony was erroneously excluded, that ruling was not prejudicial and would have been cumulative, as members of the community testified that Campos was known for aggressiveness. Thus, as with the toxicology reports, the officers' testimony would have, at most, merely bolstered those witnesses' testimony, as opposed to being central or a necessary part of their defense. Jennings, 199 Wn.2d at 66-67. Thus, we conclude that there was no violation of Shaw's right to present a defense.

3. Campos's prior assaultive conduct

    a. Background

Prior to trial, Shaw offered evidence of Campos's prior acts of violence, specifically the destruction of her brother's car the day before she was killed

and that she punched a member of her homeless community in the face. With this evidence, Shaw argued, jurors would be more likely to believe that Campos reached for his gun. Shaw claimed the evidence was "admissible even though it may be contrary to the prohibition on evidence to prove conduct in conformity . . . because it's part of the defense." The court found the evidence inadmissible propensity evidence under ER 404(b). On appeal, Shaw also argues that this evidence explains why "Shaw's response to Campos was reasonable under the circumstances" and that, without the admission of this evidence, Shaw's right to present a defense was violated.

     b. Applicable evidentiary rules

At its most general

> Character evidence might be considered relevant on four *theories*: (1) as circumstantial evidence that a person acted on a particular occasion consistently with his character, often called propensity evidence; (2) to prove an essential element of a crime, claim, or defense; (3) to show the effect that information about one person had on another person's state of mind; and (4) other purposes, such as identity or lack of accident.

State v. Donald, 178 Wn. App. 250, 255-56, 316 P.3d 1081 (2013) (emphasis added).

"ER 404 controls the admissibility of character evidence." Id. at 256. "The plain language of ER 404(a) prohibits the use of character evidence to show circumstantially that a person acted on a particular occasion consistently with his character, with two exceptions that apply only in criminal cases," neither of which

13

are relevant to this argument. Id. at 257. "ER 404(b) addresses a specialized application of ER 404(a)'s general rule excluding circumstantial use of character evidence." Id.

Namely, under ER 404(b), "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith," i.e., as propensity evidence. Evidence of other crimes "may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Id.

To admit an act under the second sentence of ER 404(b), the "'trial court must: (1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value against the prejudicial effect.'" State v. Gresham, 173 Wn.2d 405, 422, 269 P.3d 207 (2012) (quoting State v. Vy Thang, 145 Wn.2d 630, 642, 41 P.3d 1159 (2002)).

Finally, even if a court errs by excluding 404(b) evidence such that it implicates the right to present a defense, a "constitutional error is harmless if the reviewing court is convinced beyond a reasonable doubt that the same result would have been reached in the absence of the error." State v. Deal, 128 Wn.2d 693, 703, 911 P.2d 996 (1996).

c. Analysis

14

Shaw proceeds on theories (1) and (3) above, namely, that evidence of Campos's prior violent acts was admissible either expressly *as* propensity evidence outside of a 404(b) analysis, or as evidence that it was reasonable for Shaw to have the state of mind (apprehension) and react as he did (shoot her) when meeting Campos at her tent, respectively. Shaw's arguments fail for three reasons.[2]

First, as to the latter theory (apprehension), there is nothing in the record that Shaw was aware of these prior bad acts before he shot and killed Campos. Thus, he cannot show the reasonable "effect" that that "information about" Campos had on his "state of mind" as he approached her tent or interacted with her prior to the shooting, which would constitute relevancy of this information. Donald, 178 Wn. App. at 255-56.

Second, as to the former theory (propensity), Shaw characterizes the evidence of Campos's prior acts as "reverse 404(b) evidence" because he seeks

---

[2] The State further argues that neither theory was raised in the trial court and so was not preserved. It is true that "'a party may assign evidentiary error on appeal only on a specific ground made at trial.'" State v. Blake, 172 Wn. App. 515, 529, 298 P.3d 769 (2012) (quoting State v. Kirkman, 159 Wn.2d 918, 926, 155 P.3d 125 (2007) and ER 103(a)(1)). But it is also true that "if an issue raised for the first time on appeal is 'arguably related' to issues raised in the trial court, [we] may exercise [our] discretion to consider newly-articulated theories for the first time on appeal." Lunsford v. Saberhagen Holdings, Inc., 139 Wn. App. 334, 338, 160 P.3d 1089 (2007). We exercise our discretion and consider the issue here as both theories are at least "arguably related" to Shaw's original motions in limine, though the oral record was not a model of clarity, despite the trial court's best efforts.

admission of propensity evidence of a person other than the defendant. In his candor to the court, Shaw acknowledges that this court has "rejected the admissibility of reverse-404(b) evidence."[3] Finally, again in the spirit of candor, Shaw states his argument here is "to preserve the potential issue if he later seeks federal relief" as "this is still an open question in the federal courts." Indeed, nearly a decade ago, this court rejected this argument in Donald, 178 Wn. App. at 258. We decline to establish a right to "reverse-404(b)" evidence for the first time without further direction of our Supreme Court, particularly when here, the evidence relates not to any third party, but to a victim.[4]

Third, regardless of the theory, even if our Supreme Court later finds "reverse-404(b)" evidence admissible and its wrongful exclusion implicates the

---

[3] To be more precise, this court in Donald rejected a constitutional challenge to 404(b) which would have rendered 404(b) "inapplicable" and required a court to consider the admissibility of "reverse-404(b)" evidence through an evidentiary mechanism other than 404(b) analysis. Donald, 178 Wn. App. at 259, 271-72.

[4] Again, this court in Donald rejected Donald's "proposed construction of ER 404(b), which would exclude its application when propensity evidence is offered by a defendant." Donald, 178 Wn. App. at 271-72. Relying on the approach adopted in United States v. McCourt, 925 F.2d 1229, 1230, 1233 (9th Cir.1991), we held that, instead, 404(b) applies to other crimes, wrongs, or acts of third parties" because the term "person" in 404(b) is not limited to the accused. Id. at 259. While, as the concurrence notes (at 3), Donald asked the court to admit propensity evidence of an accomplice, it would rest on a distinction without a difference to not reject a similar challenge on similar grounds for the bad acts of another type of "person" (the victim), even if ER 404(a) specifically addresses when evidence of a victim's reputation may be admissible. In short, Shaw proffered the bad acts specifically as propensity evidence and the trial court did not err by considering it under 404(b).

right to present a defense, the exclusion of this evidence here was harmless because, as Shaw concedes, the jury did hear testimony about Campos's reputation for aggression and fighting from her neighbors, and it still convicted Shaw. There is no doubt the jury would have convicted Shaw even if these two additional instances of violence had been admitted.

B.  Harassment Charge

 1. Background

Prior to trial, the State moved the court to admit evidence related to an incident which occurred approximately two months after the killings (in October 2016), and for which Shaw initially was charged with felony harassment.

Specifically, Shaw and an acquaintance, Derric Lee, got into an argument at a bar. Shaw pulled out a gun and placed the muzzle on Lee's chest. Shaw's friends took the pistol from him, but Shaw later sent a message to Lee, stating: "I will kill us both for this up-coming have 30 seconds to pick me up before I kick Inn [sic.] your door with an assault rifle." Later that night, Lee saw Shaw standing outside Shaw's own apartment, which borders Lee's apartment building. Lee called the police and, again, Shaw was charged with felony harassment. Shaw pled guilty and was convicted of misdemeanor harassment through the Regional Veterans Court on August 3, 2017, which was subsequently dismissed without prejudice.

The State argued the facts related to this conviction were relevant, particularly if Shaw "pursue[d] a PTSD/self-defense" claim. The court excluded the underlying facts of the harassment charge but reserved ruling as to whether they might somehow become probative on cross-examination of Shaw or Dr. April Gerlock.

At trial, Shaw presented Gerlock, who is an Advanced Practice Psychiatric Nurse Practitioner, experienced with veterans with Post-Traumatic Stress Disorder (PTSD), as an expert witness. Gerlock testified that as a result of Shaw's experiences while serving in the United States Army in Iraq, Shaw had PTSD. She testified that, in her opinion, Shaw did not intend to kill either victim but that they startled him and he had a reactive violent response due to hyper reactivity. Gerlock further testified that, in evaluating whether someone is malingering, she considers other reactive responses displayed by the patient, reviews discovery (which here included police reports), and interviews the patient using standardized protocols.

Before Gerlock's cross-examination, the State argued the defense had opened the door to explore the harassment incident. Specifically, the State argued that it was entitled to further develop Gerlock's claim that she considered "other experiences for this person" and whether they had been "reactive" or "acted with aggression" in other situations. The defense responded that they were unsure "that she was specifically referring to the harassment charge. So, . . . the prosecution is connecting dots [which do] not . . . connect." The court granted the

18

State's motion to inquire into the facts of the harassment charge in so far as it affected "the scope and the limits" of Gerlock's opinion.

On cross-examination, Gerlock testified that she had discussed with Shaw the harassment incident and the threat to kill Lee. Gerlock agreed that she now understood that Shaw had "[a] little sliver of insight" in October 2016 regarding his PTSD, and that could be relevant to his level of insight at the time of the killings. Gerlock further testified that, despite his statements in the harassment charge, the facts of the felony harassment did not disturb her prior opinions. Gerlock finally testified that the additional information in the police reports from that incident did not affect her ultimate opinions as to his inability to form the requisite intent.

2. Law

"Trial courts have broad discretion in determining the scope of cross-examination, particularly with respect to the examination of experts." In re Det. of Griffith, 136 Wn. App. 480, 485, 150 P.3d 577 (2006); Dinner v. Thorp, 54 Wn.2d 90, 96-97, 338 P.2d 137 (1959) (rules of cross-examination should be liberal for expert witnesses). "When a subject has been opened on direct examination, the cross-examination may develop and explore the various phases of that subject." State v. Hayes, 73 Wn.2d 568, 571, 439 P.2d 978 (1968).

3. Analysis

On appeal, Shaw argues that the court abused its discretion in finding that the defense opened the door and allowing the State to question Gerlock about

19

Shaw's vacated harassment conviction, in part, because it was "not relevant to impeach" her opinion and, in part, because prejudice to Shaw outweighed the probative value under ER 403. The State counters that Gerlock had considered the incident in forming her opinion and had discussed it with Shaw. Both parties rely on State v. Hamilton, 196 Wn. App. 461, 474, 383 P.3d 1062 (2016), which stands for the proposition that when an expert did not review the underlying unadmitted documents, did not rely on them in forming her opinions, and did not discuss the documents on direct examination, admission of the facts or statements within the documents is improper.

As to opening the door, we conclude that, given the broad discretion allowed to courts considering the scope of the testimony of experts, it was not an abuse of discretion to permit the cross-examination conducted. Again, Gerlock testified that she did consider information about the harassment incident in forming her opinions. Gerlock further testified that she spoke to Shaw about the incident because "that particular event was relevant" to his experience. Based upon her review and this discussion, Gerlock concluded that, while Shaw had "a little sliver of insight" in October 2016 about his PTSD, it did not change her opinion about his level of insight at the time of the killings. A reasonable person could "take the view" the court adopted in allowing the State to explore the contours of her review of the records, discussion with Shaw, and why she did not change her opinion.

Atsbeha, 142 Wn.2d at 914. Thus, the court did not abuse its discretion. Hamilton, 196 Wn. App. at 474, does not hold otherwise.

Further, to the extent there was any discussion about the underlying police reports, it was Shaw's counsel who elicited the statements, memorialized in the police reports, which Shaw made to the police about his intent to kill Lee. Thus, error in admitting those statements was invited and not a basis for reversal. A party cannot set up an error in the trial court then complain of it on appeal. In re Pers. Restraint of Tortorelli, 149 Wn.2d 82, 94, 66 P.3d 606 (2003).

Finally, we conclude that Shaw has not shown "within reasonable probabilities" that the outcome of the trial would have been materially affected had the error not occurred. State v. Brockob, 159 Wn.2d 311, 351, 150 P.3d 59 (2006) (quoting State v. Bourgeois, 133 Wn.2d 389, 403, 945 P.2d 1120 (1997)). Shaw argues only that the facts of the harassment charge "made him look extremely bad, like someone with a penchant for violence." However, the force and purpose of the contested testimony related to his ability to form the requisite intent. And on that point, Gerlock's testimony was unchanged. In other words, the admission of the contested testimony merely allowed the parties to explore why, despite the charge, Gerlock continued to maintain her position. In that sense, the testimony was, at a minimum, harmless. However, here, the testimony in fact favored the defense, as Gerlock did not budge from her opinion that Shaw did not form the requisite intent two months earlier, and in fact used the harassment incident to

21

further contrast his state in October with his decompensation in August. Either way, there has been no showing that the outcome of the trial would have been different.

For these reasons, we conclude that there was no error in allowing the State to cross-examine Gerlock in the way it did.

C.       First Aggressor Instruction

    1. Background

Prior to trial, the parties effectively agreed to a standard self-defense instruction. After some debate between the parties and over defense counsel's objection, the court granted the State's additional request to give the first aggressor instruction, which read:

> No person may, by any intentional act reasonably likely to provoke a belligerent response, create a necessity for acting in self-defense and thereupon kill another person. Therefore, if you find beyond a reasonable doubt that the defendant was the aggressor, and that defendant's acts and conduct provoked or commenced the fight, then self-defense is not available as a defense.

Specifically, with respect to Dias, the State argued, "even if Mr. Dias armed himself with a baseball bat, Defendant came back looking for witnesses with a gun . . . [and] that instruction is very important to explain that Mr. Dias was allowed to repel force from someone who came with a gun to kill him." With respect to Campos, the State pointed to evidence from fellow camp residents, including that

"she asked, 'Are you here to kill me?' And essentially the response was he pulled a gun out and pointed it at her," making Shaw the first aggressor.

As to Dias, Shaw responded "there is no provocative act in the evidentiary record committed by Mr. Shaw," arguing his mere presence was not a provocation. Regarding Campos, Shaw acknowledged that the testimony of the homeless residents made it "a tougher call from a defense point of view."

In siding with the State, the court found (1) the direct testimony established Shaw was not merely in the encampment generally, but was in the living space of the encampment where Dias was sleeping; and (2) circumstantially, rather than removing himself when Dias was awakened, Shaw "slid[] past" Dias's tent and took a less secure route. The court found that both could be viewed as "intentional act[s] reasonabl[y] likely to provoke a belligerent response."

2. Law

"The use of force is lawful and justified where the defendant has a 'subjective, reasonable belief of imminent harm from the victim.'" State v. Grott, 195 Wn.2d 256, 266, 458 P.3d 750 (2020) (quoting State v. LeFaber, 128 Wn.2d 896, 899, 913 P.2d 369 (1996), abrogated on other grounds by State v. O'Hara, 167 Wn.2d 91, 217 P.3d 756 (2009)). "The amount of force used must be 'not more than is necessary.'" Id. "If the defendant meets the 'initial burden of producing some evidence that his or her actions occurred in circumstances amounting to self-defense,' then the State has the burden to prove the absence of

23

self-defense beyond a reasonable doubt." Grott, 195 Wn.2d at 266 (quoting State v. Riley, 137 Wn.2d 904, 909, 976 P.2d 624 (1999)).

"However, in general, the right of self-defense cannot be successfully invoked by an aggressor or one who provokes an altercation." Riley, 137 Wn.2d at 909.

> [T]he question of whether a first aggressor instruction should be given is a highly fact-specific inquiry, such that broad, bright-line rules are rarely appropriate. Where, as here, the issue on appeal is whether the evidence was sufficient to support giving a first aggressor instruction, appellate courts must carefully consider the specific evidence presented at trial in the light most favorable to the requesting party.

Grott, 195 Wn.2d at 267.

More broadly, "An aggressor instruction is appropriate if there is conflicting evidence as to whether the defendant's conduct precipitated a fight." Riley, 137 Wn.2d at 910. More narrowly and relevant here, when there is evidence of the defendant drawing his gun first and aiming it at another person, the giving of an aggressor instruction is proper. State v. Wingate, 155 Wn.2d 817, 821-23, 122 P.3d 908 (2005).

Whether there is sufficient evidence to support a first-aggressor instruction is a question of law, reviewed de novo on appeal. State v. Anderson, 144 Wn. App. 85, 89, 180 P.3d 885 (2008). In determining the sufficiency of the evidence, our standard of review is "whether, after viewing the evidence in a light most favorable to the State, any rational trier of fact could have found the essential

elements of the charged crime beyond a reasonable doubt." State v. Rempel, 114 Wn.2d 77, 82, 785 P.2d 1134 (1990) (citing State v. Green, 94 Wn.2d 216, 221, 616 P.2d 628 (1980), overruled on other grounds by Washington v. Recuenco, 548 U.S. 212, 126 S. Ct. 2546, 165 L. Ed. 2d 466 (2006)).

3.  Analysis

We conclude that it was proper to give the first aggressor instruction, as it allowed both sides to argue their theories of the case (self-defense for Shaw; first aggressor for the State) and the instructions properly explained the applicable law. Riley, 137 Wn.2d at 909.

As to Campos, the instruction was appropriate as there was testimony that Shaw arrived at the encampment to fight her or kill her. Specifically, there was testimony, which we must view in the light most favorable to the State, that Shaw arrived with a holstered pistol at his hip, went to the door of her tent, said he was going to kill her, and when she got up to face him, unarmed, Shaw shot her three times. Shaw argues that there may have been conflicting evidence that Campos lunged at Shaw first. But conflicting evidence as to whether the victim or defendant's conduct precipitated a fight is exactly a situation in which a first aggressor instruction may be appropriate. Riley, 137 Wn.2d at 909

As to Dias, the instruction was appropriate as there was testimony that Shaw, still with a holstered pistol at his hip, went to the encampment "looking for

witnesses." These facts alone, viewed in the light most favorable to the State, would make him a first aggressor.

Further, as the court noted, there was testimony that Shaw may have precipitated a belligerent response by, "sliding past" Dias's tent, rather than removing himself through a more secure route.

Finally, while mere presence may not be sufficient, an unlawful act is not required to justify the instruction; a defendant may provoke a fight by arming himself and appearing at a location where it is reasonably likely to provoke a belligerent response. Richmond, 3 Wn. App. 2d at 434.

Here, while he may or may not have had his pistol unholstered before encountering Dias, Shaw acknowledged on cross-examination that he was "back at the same encampment where [he] had killed somebody less than 12 hours before," that he did not explain to Dias why he allegedly was there (to "get my thoughts together"), and that it would have been "reasonable for someone at the encampment to be scared after what happened the day before." Tellingly, Shaw himself testified that "I shouldn't have been there, that my presence there was not necessary, and that if I hadn't have been there, none of this would've happened." 1 Report of Proceedings (RP) at 816. These facts, viewed in the light most favorable to the State, could have provoked the belligerent response even Shaw testified to.

In response, Shaw again points to possible conflicting evidence, which, for the reasons and authority provided above, is unavailing given the standard and nature of our review.

We find it was not error to give the instruction.

D.    Prosecutorial Misconduct

  1. Law

The right to a fair trial is a fundamental liberty secured by the Sixth and Fourteenth Amendments to the United States Constitution and article I, section 22 of the Washington State Constitution.  Estelle v. Williams, 425 U.S. 501, 503, 96 S. Ct. 1691, 48 L. Ed. 2d 126 (1976).  Prosecutorial misconduct may deprive a defendant of the fair trial guaranteed him under the state and federal constitutions. Miller v. Pate, 386 U.S. 1, 87 S. Ct. 785, 17 L. Ed. 2d 690 (1967); State v. Monday, 171 Wn.2d 667, 676-77, 257 P.3d 551 (2011).

"In a prosecutorial misconduct claim, the defendant bears the burden of proving that the prosecutor's conduct was both improper and prejudicial."  State v. Emery, 174 Wn.2d 741, 756, 278 P.3d 653 (2012).  Prejudice is established where there is a substantial likelihood that the misconduct affected the jury's verdict. Monday, 171 Wn. App. at 675.

A prosecutor has wide latitude in closing argument to draw reasonable inferences from the evidence and to express such inferences to the jury.  State v. Boehning, 127 Wn. App. 511, 519, 111 P.3d 899 (2005).  But it is misconduct for

the prosecutor to misstate the law or to appeal purely to the passions and prejudices of a jury.  State v. Allen, 182 Wn.2d 364, 373-75, 341 P.3d 268 (2015); State v. Belgarde, 110 Wn.2d 504, 507-08, 755 P.2d 174 (1988).

"A defendant's failure to object to a prosecuting attorney's improper remark constitutes a waiver of such error, unless the remark is deemed so flagrant and ill-intentioned that it evinces an enduring and resulting prejudice that could not have been neutralized by an admonition to the jury."  State v. Stenson, 132 Wn.2d 668, 719, 940 P.2d 1239 (1997).  "If misconduct is so flagrant that no instruction can cure it, there is, in effect, a mistrial and a new trial is the only and the mandatory remedy."  State v. Case, 49 Wn.2d 66, 74, 298 P.2d 500 (1956).

2.  Analysis

Shaw claims that the prosecutor committed misconduct by repeatedly referencing the harassment charge in the closing argument and by misstating the law on self-defense.

As to the references to the harassment charge in closing argument, as reviewed above, there was no error in allowing the State to cross-examine Gerlock about the harassment charge.  Thus, mere reference to that testimony would not have been improper.  For this reason, Shaw argues that the misconduct occurred when the prosecutor repeatedly referred to the harassment case as the "threats to kill" case, both because it appealed to the passions of the jury and because it was

factually inaccurate because, while the initial charge was for felony harassment, the vacated conviction was for misdemeanor harassment.

Indeed, the prosecutor referred to "threats to kill" three times in closing. However, each allusion to the "threat to kill" or "threat to kill case" was in the context of the State's attack on Gerlock's testimony, which it described as suffering from confirmation bias, and in particular her unmoving conclusion that Shaw had no insight into his PTSD. In other words, the point of that portion of closing argument was to highlight the failures of Gerlock's testimony, not to paint Shaw, as his opening brief analogizes to, like persons who are "madmen" or "butchers that kill indiscriminately."

Moreover, during her testimony, Gerlock agreed that she had "mentioned in [her] report that [she] saw that [Shaw] had gotten a charge for felony harassment," stating "[t]hat's correct." The case was referred to as the "felony harassment" incident or charge during Gerlock's testimony before the jury, even by defense counsel. Furthermore, Gerlock testified that she knew felony harassment could involve a threat to kill. 1 RP at 677; see RCW 9A.46.020(2). Thus, it was not factually inaccurate for the prosecution to so refer to the incident in closing.

As to the statement of law, the State said in closing:

> [Self-defense is] also not a subjective standard. Meaning you don't just say, oh, well, you know, what would a reasonable person who has PTSD who's really bitter, who's really angry about things, and who is drunk, what would they do? That's not the standard. There's still a requirement of reasonableness.

We find that this is not a misstatement of the law regarding self-defense because it is true that self-defense is not solely a subjective test.  Grott, 195 Wn.2d 266. The person seeking that defense has to have a subjective but reasonable belief that harm is imminent.  Id.  In the prosecutor's statements, the terms "just" and "still" do a lot of work to make clear that there are both subjective and objective components to the defense.  State v. Walden, 131 Wn.2d 469, 474, 932 P.2d 1237 (1997) ("This standard incorporates both objective and subjective elements.); State v. Brightman, 155 Wn.2d 506, 520, 122 P.3d 150 (2005); State v. Read, 147 Wn.2d 238, 242-43, 53 P.3d 26 (2002).

Further, even if either the references to "threats to kill" or the statement on the law was made in error, Shaw made no objections to the remarks or statement of the law, even though both were subjects of extensive discussion.  When there is no objection by defense counsel it "strongly suggests to a court that the argument or event in question did not appear critically prejudicial to an appellant in the context of the trial."  State v. McKenzie, 157 Wn.2d 44, 53 n.2, 134 P.3d 221 (2006) (quoting State v. Swan, 114 Wn.2d 613, 661, 790 P.2d 610 (1990) (overruled on other grounds)).  As Shaw did not object at trial, he must demonstrate an enduring prejudice that could not have been obviated by a curative instruction. Stenson, 132 Wn.2d at 719.

Shaw does not make such a showing. First, the jury was properly instructed to decide the facts based on the evidence presented and not to let sympathy or prejudice affect their decision, which would obviate any alleged appeal to passions. Jurors are presumed to follow the court's instructions. State v. Lough, 125 Wn.2d 847, 864, 889 P.2d 487 (1995). Second, the court provided a proper instruction on self-defense and justifiable homicide, which would obviate any alleged misstatement of the law. In short, Shaw does not show such misconduct, assuming any occurred, was ill-intentioned or incurable.

E. Severance of the Crimes

1. Background

In addition to his attorney's briefing on appeal, Shaw submitted a statement of additional grounds. Statements of additional grounds are permitted by RAP 10.10. They serve to ensure that an appellant can raise issues in their criminal appeal that may have been overlooked by their attorney. Recognizing the practical limitations many incarcerated individuals face when preparing their own legal documents, RAP 10.10(c) does not require that the statement be supported by reference to the record or citation to authorities. However, it does require that the appellant adequately "inform the court of the nature and occurrence of alleged errors." RAP 10.10(c). It also relieves the court of any independent obligation to search the record in support of the appellant's claims, making it prudent for the appellant to support their argument through reference to facts. RAP 10.10(c). To

enable that factual support, it provides the means for appellants to obtain copies of the record from counsel. RAP 10.10(e).

2. Analysis

In his statement of additional grounds for review (SAG), Shaw asserts, separately from his appellate counsel and non-duplicatively, that there should have been two trials; one for each murder charge.

Under CrR 4.4.(a)(1),

> A defendant's motion for severance of offenses or defendants must be made before trial, except that a motion for severance may be made before or at the close of all the evidence if the interests of justice require. Severance is waived if the motion is not made at the appropriate time.

The court may also order a severance on its own motion. CrR 4.4(e).

Additionally, "[t]he failure of the trial court to sever counts is reversible only upon a showing that the court's decision was a manifest abuse of discretion." State v. Bythrow, 114 Wn.2d 713, 717, 790 P.2d 154 (1990) (citing State v. Philips, 108 Wn.2d 627, 741 P.2d 24 (1987) (joinder of defendants); State v. Thompson, 88 Wn.2d 518, 564 P.2d 315 (1977) ("Defendants seeking severance have the burden of demonstrating that a trial involving both counts would be so manifestly prejudicial as to outweigh the concern for judicial economy."); Bythrow, 114 Wn.2d at 718.

In this case, Shaw made no motion for severance, waiving the issue under CrR 4.4.(a)(1). Shaw also has made no showing of either a manifest abuse of

discretion or prejudice. On the contrary, on the facts reviewed above, it is hardly an abuse of discretion to try both killings—which occurred in a period of about 12 hours, involving the same means, in the same location, and the same claimed defense (self-defense)—at the same time to "promote a fair determination of the defendant's guilt or innocence of each offense." CrR 4.4(b). Further, the police investigations and the reporting to Shaw's friend were entirely intermingled, making their separation patently difficult.

In short, a request to sever was not preserved, but, even if it had been or the court should have severed on its own motion, it was not an abuse of discretion for the court not to do so.[5]

### III.    CONCLUSION

We affirm.

Díaz, J.
_____

I CONCUR:

Chung, J.
_____

---

[5] Additionally, Shaw argues separately from his counsel that the prosecutor committed misconduct by making an improper remark during opening statement about Shaw kicking Campos after he shot her. SAG at 2. Apparently, Shaw misheard because the prosecutor made no such reference. RP at 965; see also RP at 1665 (where Hanson testified that Shaw kicked a victim). But even if Shaw were correct, it would not warrant reversal as there was no objection or remotely a showing that this claimed misconduct was ill-intentioned and flagrant. Case, 49 Wn.2d at 74.

## State of Washington v. Bradley T. Shaw, No. 83182-8-I

BOWMAN, J. (concurring) — I agree with my colleagues that Shaw identifies no error warranting reversal of his convictions. But I respectfully disagree with the majority's legal analysis of the admissibility of a victim's specific acts of violence when a defendant claims self-defense. As a result, I am compelled to concur in the result only.

At trial, Shaw argued that he killed Campos in self-defense. In that regard, Shaw moved in limine to admit two prior specific acts of violence by Campos "as relevant to the element of proof that is borne by the prosecution to establish beyond a reasonable doubt that [Shaw]'s response to . . . Campos was unreasonable." The trial court excluded the evidence. It concluded that "[ER] 404(b) governs" and that it was not persuaded the evidence "falls into one of the exceptions of 404(b)."

On appeal, Shaw contends that "the question here is whether a traditional ER 404(b) [analysis] applies when [character] evidence is offered by a defendant in support of his defense." I disagree. In my view, the question is whether ER 404(b) governs the admissibility of evidence of a victim's character when a defendant is claiming self-defense. I would conclude that it does not.

A defendant claiming self-defense may introduce two kinds of evidence related to the victim's character, but ER 404(b) governs neither. First, a

defendant may introduce evidence about the victim's reputation for violence. State v. Alexander, 52 Wn. App. 897, 900, 765 P.2d 321 (1988). "Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion." ER 404(a). An exception to that rule is that "[e]vidence of a pertinent trait of character of the victim of the crime offered by an accused" is admissible. ER 404(a)(2). Evidence of a victim's violent disposition is a pertinent character trait relevant to whether the victim was the first aggressor. Alexander, 52 Wn. App. at 900. As a result, such evidence is admissible despite its propensity effect. Id. But evidence offered for this purpose "must be in the form of reputation evidence, not evidence of specific acts." State v. Hutchinson, 135 Wn.2d 863, 886, 959 P.2d 1061 (1998), abrogated on other grounds by State v. Jackson, 195 Wn.2d 841, 467 P.3d 97 (2020). A party may use specific acts to prove character only where the pertinent character trait "is an essential element of a charge, claim, or defense." ER 405(b). Specific-act character evidence of a victim's propensity for violence is not an essential element of self-defense. State v. Martin, 169 Wn. App. 620, 629, 281 P.3d 315 (2012).

Second, evidence of the victim's reputation or specific violent acts may be admissible to show the defendant's state of mind at the time of the crime and to indicate whether the defendant had reason to fear bodily harm. State v. Cloud, 7 Wn. App. 211, 218, 498 P.2d 907 (1972). In this context, the evidence is not being admitted to prove that the victim acted in conformity with prior violent acts. Instead, the evidence is admitted to show the reasonableness of the defendant's

fear of the victim.  State v. Burnam, 4 Wn. App. 2d 368, 376, 421 P.3d 977 (2018).  Such evidence is relevant only if the defendant knew of the reputation or acts before committing the crime.  State v. Duarte Vela, 200 Wn. App. 306, 326, 402 P.3d 281 (2017).

Here, Campos' alleged violent acts were not admissible under ER 404(a)(2) because they did not amount to reputation evidence.  And they were not admissible to show Shaw's state of mind at the time of the murder because he did not know of them when he killed Campos.  The analysis does not call for application of ER 404(b).

Because ER 404(b) does not apply here, we need not address Shaw's argument that we should reject State v. Donald, 178 Wn. App. 250, 316 P.3d 1081 (2013).  In Donald, we refused to adopt the defendant's "proposed construction of ER 404(b), which would exclude its application to evidence offered by a defendant."  Id. at 272.[1]  And we disagreed that exclusion of such evidence violated his constitutional right to a defense.  Id. at 271-72.  But at issue in Donald was propensity evidence offered to show the violent disposition of an alleged "other suspect."  Id. at 255.  Unlike the circumstances here, that analysis called for the application of ER 404(b).

The majority accepts Shaw's framing of the issue at face value, and its analysis implies that the trial court properly applied ER 404(b) to determine the admissibility of Campos' alleged violent acts in the context of Shaw's self-

---

[1] Shaw and the majority label this concept "reverse 404(b) evidence."  In Donald, we refused to adopt the term because "[w]e do not find this relabeling of propensity evidence helpful to our analysis."  Donald, 178 Wn. App. at 258 n.4.  For the same reason, I do not adopt the term here.

3

defense claim. But a court's obligation to follow the law remains the same, regardless of the parties' arguments. State v. Quismundo, 164 Wn.2d 499, 505-06, 192 P.3d 342 (2008). So, I would conclude that the trial court improperly determined that ER 404(b) governed the admissibility of Campos' alleged acts of violence. Still, because the evidence was inadmissible under ER 404(a)(2) and well established case law, I would affirm. See State v. White, 137 Wn. App. 227, 230, 152 P.3d 364 (2007) (we may affirm on any ground supported by the record). I concur in the result only.

Brunner, J